Good morning, your honors. My name is Jared Woodfill, and I have the honor of representing the appellants in this case. Dr. Stephen Hudspeth, who is an individual resident and a voter in Harris County, a congressional candidate from the 2020 congressional election for the 18th congressional district. The nominee was Wendell Champion. He too is one of my clients. 18th congressional district is located in Harris County. I also have the honor of representing a candidate who was a countywide candidate for judge named Sharon Hemphill. And finally, one of our plaintiffs in the case was State Representative Steve Toth from District 15, who was also on the ballot at the time. As the court is probably well familiar with the briefing in this case, for the first time in the history of the state of Texas, we had an election clerk create a new form of voting, something that was referred to as drive-through voting. As this court is probably well aware, there's absolutely nothing in the Texas election code that expressly provides for drive-through voting. It just doesn't exist. And that's why Harris County was unique in being the first major county to ever do this in the history of the entire state of Texas. So you have an election clerk unilaterally taking it upon himself to create a new form of voting, both in the early voting context and on election day regarding drive-through voting. And what does that actually mean? Drive-through voting is where you get in your vehicle, you actually drive to a polling location. They would argue it's a polling location, but it's a location where there is a tent. You bring your car in, place it under the tent, and then the voting materials are brought to you. In Harris County, we use the e-slate. So what that requires one to do is to unhook the e-slate from what's called a daisy chain, because that particular e-slate is typically used for disabled voters who qualify under a curbside voting provision, 64.009A of the Texas election code. But in this particular case, Mr. Hollins put in a voting scheme that allowed any individual, regardless of whether they had a qualifying disability, to cast their vote in their vehicle. So what that meant was, individuals who had numerous people in the vehicle at the time were casting votes while others were participating or viewing the process. In some cases, the record will reflect, their voting was done on Facebook or on Instagram as they were voting, telling people, showing people how they were voting, multiple people being in the vehicle. And that's why we believe the election code doesn't allow it to occur, because all of the voter integrity provisions that you find with respect to the secrecy of the ballot, the integrity of the voting process, the privacy of the voting booth, are all violated under the election scheme that Mr. Hollins put in. But the privacy for the person, so if you go and vote and you take a picture of your vote and you post that on Facebook, that's not a violation of the law. You have the right to be not private. But if I stood next to you and took a picture of your vote and put it on, that absolutely would be, and I would never do that, but that would absolutely be a violation of your privacy. You can violate your own privacy, is what I'm saying. Yes, Judge, you have two issues, though, that arise there. In that particular scenario that you describe, the election protection measures that are put in place, specifically election judges, and we have election judges and those that are allowed to observe the election processes, watchers, they are no longer able to do their jobs, because you have, in many cases, trucks that were large, and you have the election judge and the poll watcher is what they're called on the election code, no longer able to view the process. And the courts have made it very clear that if it's not expressly provided in the election code, it's not allowed. And the only situation it can be applied in if it's necessary to effectuate a provision that's expressly provided. Additionally, the Texas Supreme Court has made it very clear that you cannot imply a provision simply for convenience. And if you look at the complaint that we filed, we actually have an exhibit attached to it where Mr. Hollins, the clerk at the time, says this is being done for the convenience of all voters in Harris County. And that's simply not allowed under the Texas Elections Code. So what we have here is an election clerk unilaterally usurping the authority of the Texas legislature in creating a new provision that is not found in the Texas Election Code. And so our position is that violates Article 1, Section 4, Clause 1 of the Elections Clause of the United States Constitution. Okay, so one thing we haven't talked about is kind of the obvious, which is this was in the middle of a pandemic. Let's assume, arguendo, the pandemic ends sometime. Why is this not moot? Why do we think that this is going to keep happening? Well, two reasons, Your Honor, and I know that this was argued in the brief by the appellees. One, we know that this particular procedure is continuing in Harris County and was actually used in the May election, drive-thru voting. Now what's being done at this particular point is they are following Judge Hainan's opinion and only doing it during early voting and not on Election Day. So as the Court will recall, what Judge Hainan ordered was that it would, if the plaintiffs were to have standing, that it would be legal during early voting but illegal on Election Day. He found what I believe was an artificial distinction in the code between Election Day voting and early voting. In fact, if you look at the provisions regarding Election Day, early voting, there's a provision regarding electioneering for early voting. It's found in Section 85, actually it's in 85.056, and I'd like the Court to, I'd like to read that provision to the Court because I think it's extremely important. And remember, this deals with early voting. And it says in Section A, 85.036a, during the time an early voting polling place is open for the conduct of early voting, a person may not electioneer for or against any candidate, measure, or political party in or within 100 feet of an outside door through which a voter may enter the building or structure in which the early voting polling place is located. So the code makes it very clear that the polling place has to be located in a building or structure, and then this electioneering that's prohibited can't occur within 100 feet of the door of the entrance of that structure. What Judge Hainan does with respect to early voting is he conflates the polling place, the structure, and the voting station as one. And the code makes very clear distinctions between the building or structure, the polling place, and the voting station. And if the Texas Legislature wanted to allow drive-through voting and wanted to allow people to vote in their car, they could have very expressly and clearly stated, you can vote from your car. Your car can be the voting station, the polling place, and it can be under a tent or any type of structure that you choose. They chose not to do that. Instead, they chose to create a very narrow exception for what we call curbside voting under 64.009, where it specifically states that if a voter is physically unable to enter the polling place without personal assistance or likelihood of injuring the voter's health, on the voter's request, an election officer shall deliver a ballot to the voter at the polling place entrance or curb. That is the only provision in the entire Texas election code that allows one to vote outside the polling place or from a car or have their ballot, or e-slate in this case, detached from the daisy chain and brought to the car. Now, I think it's important to also look at what the appellees and Judge Haynen ruled on standing. Judge Haynen was unclear as to whether or not we had standing or not. And he expressed that in footnote number one, where he said to the court, I very well have standing to decide this case, in that I have a candidate who is running for the U.S. Congress and has been nominated by the Republican Party for the 18th Congressional District. So Judge Haynen took the position, based on a case out of Arizona, Arizona State Legislature versus Arizona Independent Redistricting Commission, and took that to mean that only the state legislature would have standing to pursue a violation of Article I, Section 4, Clause 1. Well, if you look at that particular case, they're only addressing whether in that redistricting case, where Arizona had an initiative and referendum process, and that initiative and referendum process created a redistricting committee, and the legislature was challenging who had the ability to actually redraw the state legislature in Arizona. In that particular case, they did say that the Arizona legislature did have standing to pursue it, but they didn't limit or say that other people wouldn't have a challenge, have the ability to challenge what an election clerk or someone else did in violation of Article I, Section 4, Clause 1. And so the only case out there that specifically addresses it is that one we cite in our reply brief from the Eighth Circuit. It's a case called, it's the Carson case, Your Honor, and in that case, it was involving Minnesota during the 2020 election. It came out on October 29th, just a few days before Judge Haynen issued his opinion, but it involved a group of electors who were challenging the time period in which the absentee ballots could be counted in Minnesota, and in that case, the Secretary of State had been sued and there was a judgment that was agreed to, a consent judgment agreed to, and it had amended the election code to allow those particular ballots to be received after the election deadline. But what's informative about that case is the court from the Eighth Circuit very clearly said that the electors were candidates, and because they were candidates, they had a unique and particularized injury that gave them standing to pursue their grievances against the Secretary of State in that particular case for unilaterally amending the Minnesota election code. Here we have the exact same situation. We have a candidate in Wendell Champion who is challenging an election clerk who has unilaterally amended the Texas election code to say something that can't be found anywhere in the Texas election code. So, I think it isn't just about being a candidate in an election. It's about whether you can show that this has an impact on you. So, yes, if they had, if you were a Republican candidate and they moved all the polling places right next to the Democratic Party's headquarters and that was the only place you could vote was right next to that, then maybe you could argue, hey, they're trying to skew the votes against me. But drive-thru voting, if it was open to everyone, then the people voting for the Republican candidate could drive-thru just as the people voting for the Democratic or Independent or Liberal or Libertarian or Green Party or any other party. Well, but the first question you would have to answer, and I would answer the negatives, is that form of voting legal? And it's not under the Texas election code. Yeah, but I'm talking about the standing. I'm not talking about whether that's the merits. You know, the merits is a separate question, but I'm saying you seem to think that a candidate always has standing and we have not ruled that. Well, I think there have been cases, for instance, when I talked about the Carson case where the court said in ensuring that the final vote tally is accurately reflected, the legal valid votes cast, that gives the candidate in that case an injury in fact and a cognizable injury under the law. Mr. Whitefield, I'm interested in whether the case is moved. The 2020 election is over. We don't know what kind of procedure they're going to follow in the next election. So tell me what relief you're seeking and why it's not moved. Well, Judge, two things. They are continuing to pursue drive-thru voting as recently as May. Secondly, the conditions that they claim were the basis for putting drive-thru voting in place, i.e. the pandemic and making it more convenient for people to vote still exist. We now have what people are referring to as the Delta variant. We're all back to wearing masks and in some states, lockdowns. So the same set of circumstances that they used as a justification for putting drive-thru voting in place, the convenience, if you will, that they clerked on. Wasn't that, I mean, didn't they get a grant to finance that operation? They argue that, Judge, but Commissioner's Court has plenty of money to allocate the five to eight million dollars if they want to do so. I mean, if you read in the paper, it seems like the legislature is going to change that, doesn't it? Well, Judge, it appears that that isn't going to happen because we have a group that's fled to Washington, D.C. on all over to prevent that from happening. But that's the very reason I think it's important for this court to address it, because it's just as Thomas said in his dissent in the Republican Party of Pennsylvania case, this is the time to do it. When we have two years approximately or two years or less prior to election to make this clear, because when you're dealing with election law cases immediately after the elections occurred and briefing is on a truncated basis, the court doesn't have the time to thoughtfully deal with the briefing. And I think that's why Justice Thomas, Justice Alito, and Justice Gorsuch were so correct in discussing the mootness and the ripeness issue with respect to these . . . We have dealt with matters on an emergency basis and certainly district judges have. So I'm not really . . . I mean, we get death penalty emergency motions sometimes the day of. There couldn't be anything more important or anything more limited by time. So I don't agree that just because things can happen quickly that that means that the judge is unable to . . . I mean, yes, we prefer more time. Everybody does. But that doesn't mean we can't rule on it. Well, you're right, Judge. But as you know, there are a series of cases out there dealing with whether or not it's capable of repetition. And in this particular case, not only is it capable of repetition, but it's already occurring. And it's evading review. And evading review is this discussion of the timing. I mean, again, if it was chopping down a tree in an hour, maybe you don't have time to go to the district court and the court of appeals in an hour. But elections, usually, they set out what their standards are and so forth in advance. And so you would have time, wouldn't you, to get to the district court? Judge Hannon rules quite promptly or any other judge. But what . . . On an emergency basis, et cetera. And that's why one of the things we've asked for on page two of our complaint is declaratory relief. And we were asking the court to declare that this particular policy violated Article I, Section 4, Clause 1. We'd asked for a preliminary injunction, which this court, as well aware, was denied based on standing. And then we were ultimately asking for a permanent injunction. And so I would cite the courts to Moore v. Hausman, where in that particular case, the second prong of the capable of repetition says, is there a reasonable expectation that the same complaining party will be subject to the same action? And I think in this particular case, that's absolutely happening now and is going to happen again if you take the scenario Thank you, Your Honor. Time is up. Thank you, Judge. Thank you. I know I caused you to be over your time. Thank you, Your Honor. All right. You reserve time for rebuttal. Yes, Your Honor. Thank you. So we will now hear from Mr. Post. Good morning and may it please the court. The Article III justiciability requirement . . . Mr. Post, before we get started . . . Yes, Your Honor. . . . I want to make sure I understand the scope of your representation. I realize you came to this case quite late. Yes, Your Honor. I'm looking at the notice of appearance that you filed about two weeks ago and it looks like you're representing Ms. Hudspeth in her official capacity as the Harris County Clerk. That's correct, Your Honor. Is it your position that the Harris County . . . a suit in an official capacity suit against the clerk is a suit against the county? Your Honor, I haven't considered that question. Let me put it differently. Were you retained by the Commissioner's Court? I was not retained formally by the Commissioner's Court, no. Well, how else would the Harris County, the new clerk, retain counsel in her official capacity? Your Honor, the Harris County attorney authorized my engagement under the engagement of Mr. Mitoff, who was engaged as lead counsel on behalf of the clerk. And so I'm looking at his brief. I realize that's why I want to clarify this at the beginning because I'm looking at the brief he filed, which seems to be . . . it talks a lot about the Commissioner's Court and what Harris County is authorized, where the grants come from. There's a lot of representations about the relationship between Harris County, the Commissioner's Court, the county clerk, this new person called the Harris County Elections Administrator. Yes, Your Honor. I just want to make sure I understand. You're retained by the Harris County attorney who represents Harris County. Well, Your Honor, I want to be very conscientious with the court. My best understanding is that Mr. Mitoff was engaged by the Harris County clerk. I do not know the details of the circumstances underlying that engagement. I was authorized by the Harris County attorney to appear as counsel with Mr. Mitoff in that capacity. And candidly, I can't tell the court anything more detailed than that about those circumstances. Great. Do you have a view about whether Harris County violated the election code in any way in the 2020 election? Your Honor, it is my view that Harris County did not violate the elections code. Let's go through a few provisions because I'm confused. Of course. First, I'm looking at section 61.003, which prohibits the posting of, quote, political signs and literature with 100 feet of a polling place. What did Harris County do to prevent people from driving into the tents with bumper stickers on their cars? Your Honor, I don't know that the record reflects anything about that issue in one way or another. There's nothing in the record that refers to bumper stickers on cars or any other political I'm looking at section 64.002, which provides that only one person at a time can occupy a voting booth or a voting station. What did Harris County do to prohibit more than one person at a time from occupying a voting booth or a voting station? Your Honor, I don't think the record speaks to any actions taken by Harris County in that respect. What the record reflects is a couple of declarations that were introduced by the multiple individuals who were in the vehicles, and then there are numerous declarations that were introduced by the various intervenors attesting to compliance with the various requirements of the voting procedure. Well, that's interesting. I thought that one of the positions that Harris County took in authorizing the drive-thru voting was that one of the great benefits is that while you're sitting in your car, that is while you're in your polling station, that you can converse with your loved ones. Your Honor, that was a public statement made by the county clerk at the time. That is an entirely accurate reading of the record that that statement was made as a public statement. I don't know that it was the official basis of the decision to authorize it. Is the position of Harris County as we're sitting here today that only one person could appear in a car at a voting, in a drive-thru voting station? Your Honor, I haven't conferred with the Harris County decision makers about that question. Well, this is certainly in the complaint. It's one of the allegations the plaintiffs have made. I would think, I realize again that's why I wanted to clarify sort of the lateness of your arrival to the case and how you're doing it. Of course. I would think that you would have a position on an allegation that the plaintiffs have made that there were multiple people in cars. I do have a position on that, Your Honor, and my position is that the Harris County  Election Code, and if there are variances, then those variances are to be taken up in the ordinary course through a state lawsuit, a state election context. They're not federal questions. They don't rise to the level of a significant departure from the legislative scheme, and they don't state any cognizable equal protection violation. Do you think it would be a significant departure from Section 64.002 for a county to authorize multiple people in a voting station? Your Honor, I'm actually not convinced that that would rise to the level of a significant departure, but I certainly understand the seriousness of the Court's question. Nothing in the decision to authorize drive-through voting, nothing in the Commissioner Court's action, which is the official action that authorized drive-through voting, in any way authorized multiple individuals being in vehicles. So to the extent that occurred, that was a drive-through voting as a native form of voting. That's just an election context issue. I'm sorry, I didn't mean to interrupt. I apologize. I didn't mean to interrupt. Did I cut off the sentence? No, no, not at all. How many provisions of the election code would the Harris County election officials have to decide not to enforce before it would be a significant departure from the statute? Your Honor, I don't think it's a matter of quantitatively counting numbers. I think what the Rehnquist concurrence in Bush v. Gore contemplated is a significant departure in that it completely displaces the legislative scheme such that no reasonable person could have believed that it was a fair reading of the legislative scheme. I don't think that the Harris County clerk who proposed this recommendation or the Commissioner's Court that adopted it adopted it with any intention of violating any provision of the election code. They simply designated a new polling place. If that was not fulfilled in precise accordance with the terms of the election code, there are remedies for that under state law. That's not a federal question. Is the position of Harris County today that it could authorize voting from home? Let's say come the fall that the Lambda variant is with us. Could Harris County say, look, it's too dangerous for people to come out. We need a countywide lockdown. We would like everyone to vote from home. Please send an email to Ms. Hudspeth with your vote. Could Harris County do that? Your Honor, I don't believe Harris County would take that position, and I believe that although you might have arguments, and I assume this is what the Court's contemplating about, whether that's within a building or a structure, there are other aspects of the election code that would foreclose locating a polling place in a private residence. Really? I understand the position, and again, you didn't write the brief, but your predecessor counsel takes the position that as long as it's in a building or a structure, the rest of this is dispensable. I think that's not correct, Your Honor. I think that that was framed in contrast to the particular argument made by the appellants. There are other provisions in the code that specify that a private residence cannot be the basis of a polling place, and so Harris County would not take the position that it could locate a polling place inside a private residence. What if it said you can vote as long as you go to your place of work? I don't know about the code provisions on that. I would anticipate that that would likewise be foreclosed by code provisions, but candidly, Your Honor, I am not familiar with those provisions. Section 62.004 of the election code provides that election officers and poll watchers must be able to observe voting. Were election officers and poll watchers in the cars? Your Honor, election officers and poll watchers had access inside the tents, and the evidence in the record is that those individuals were able to observe voting inside the vehicles. There is, in fairness, a declaration from the plaintiffs from one election official who said it was difficult to see into some of the vehicles, but there's also evidence to the contrary. I'm looking over your shoulder because that would violate your privacy. If I'm voting, I'm a judge. I don't want people to know, including poll watchers, who I'm voting for because I'm not allowed to take political views, but I am allowed to vote. So, I don't know that that rule means that some poll watcher should be watching over your shoulder. I'm voting in a lot of Texas elections, and they didn't come stand over my shoulder. They were sitting at the desk where I signed in, which is where they should be. I would agree with that, Your Honor, and I think that the record reflects that the poll watchers had access to the polling place that was comparable to the access in every traditional polling place. What about weapons? So, the Texas Penal Code says, this is Chapter 46, Section .03, prohibits knives, clubs, and firearms at polling places. Is the position of Harris County that you're allowed to bring a handgun in your truck to the drive-through polling station? Your Honor, I'm not aware of any position having been taken on that issue. To the extent that the law doesn't permit a weapon to be brought into a polling place, I would anticipate Harris County would take the same consistent position as with respect to any other. Did they take it in 2020? Your Honor, I don't know that that issue was ever raised, and I think that that underscores the justiciability problems with the case, that these are a number of hypotheticals that are not reflected by our record, that are not at issue in the November 2020 election, and to the extent there are future elections that want to litigate those issues, that's the occasion for a ripe controversy, and if I may, I'd like to... Before we get to the merits, which are extremely interesting, I do want to be sure we have jurisdiction. Yes. So we have standing, mootness, ripeness. Do you want to address those? I do, Your Honor. I'd like to begin with the Court's questions regarding the mootness of this particular dispute, and I would invite the Court to consider the Rennie decision from the United States Supreme Court in 1991. Two important propositions from that case. The first is that past exposure to challenge conduct does not provide standing to seek conjunctive relief when there is no continuing present adverse effects. The second proposition from that case is that the Court carefully limited its consideration of that test to the evidence in that record. Now, you just heard an argument from counsel that there is further drive-thru voting in Harris County. Nothing in this record reflects anything about ongoing drive-thru voting. Now, I want to tell you precisely what is in our record, and I want to then be very candid with the Court about the current state of affairs. First, the record reflects, as I believe the Court inquired, that the Commissioner's Court, which has the official responsibility to fix these polling places, made a decision only for the November 2020 election. The record does not reflect any decision by the Commissioner's Court with respect to any further elections. Second, it is a matter of public record that the new Harris County Elections Administrator is supportive of drive-thru voting, and to the extent drive-thru voting is permitted, will recommend to the Commissioner's Court in elections subject to the Commissioner's Court's approval, that drive-thru voting be used. I don't see how that doesn't end the entire mootness discussion. The position you just took, I don't see why the case is now—I mean, it might have been moot right up until that sentence, but then once you tell us that your client intends to do this in the future, I don't see why it's not— Your Honor, that individual is not my client. I thought you said— That individual is the newly appointed Harris County Elections Administrator who has, under the Texas Elections Code, superseded the authority of the County Clerk, who is my client, to make recommendations with respect to elections. And that's the point— But they're recommendations that the County Commissioner's Court is going to have to make. They are recommendations that the Commissioner's Court makes the ultimate decision on, on elections that are—the elections that are at issue in this litigation. The election to which counsel referred previously was a contracted election in which Harris County administered the election for another political subdivision. There has been no determination made by the Harris County Commissioner's Court or the new Harris County Elections Administrator with respect to any future election for which any of these individuals have complaints. And I do want to make not only a mootness point, but a redressability point. Judge Haynes, you asked about mootness. Counsel argued about capable of repetition but evading review. And I want to point the Court to Judge Haynes' decision in the Libertarian Party v. Dardenne opinion in 2010 because there the Court distinguished the Moore opinion that counsel relied on and made the point that in Moore, there was an official statement in the record of that case that the government officials would continue the same challenge practice. In the Libertarian County case, there was no such statement in the record. And the Court said the possibility that the elected officials might continue that conduct does not give rise to the exception. So what do we do with the timing? How far out, so let's talk about the 2022 election, November 2022, where we'll have Governor and a whole bunch of other people. How far out from that would Harris County Commissioner's Court have to vote to say, let's have a drive-thru? Your Honor. How much time would there be to go to the District Court, us, maybe even the Supreme Court, whatever? I think we can use our record as a reasonable model to answer that question. The Commissioner Court's approval was issued in August of 2020 in anticipation of the November election, and the Commissioner's Court would be required to make a determination for the May primary elections and would be required to make a determination for the November general elections in 2022. I think it's reasonable to infer from this record that that determination would be made several months in advance. I mean, they have to be setting up for election. Exactly, Your Honor. It's a very complicated undertaking. And I have to say, I acknowledge the force of the questions that Judge Oldham is asking. There's an opportunity to litigate those questions in a right context with respect to a particular controversy when that arises. Respectfully, I'll suggest that it's a matter for the state courts, but regardless, it's not a matter for this Court. And let me remind the Court of one other proposition that I think relates to these justiciability concerns. The Supreme Court, both in Texas versus United States and in the Rennie case, pointed out that deferring adjudication was jurisprudentially prudent because it would allow state courts an opportunity to weigh on the question of state law. Here, as the Court indicated, there's a special session that's been called to determine whether to even permit the possibility of drive-through voting going forward. This is a political controversy. It's in the political sphere, and the Court should not intervene. Article 3 dictates that the Court should affirm the dismissal. Give us two sentences on why these people lack standing. So, putting out the mootness issue. Absolutely, Your Honor. With respect, there's really one sentence that captures it all. All of the complaints that are made in this record by these litigants are generalized grievances about an alleged failure to comply with the Texas Election Code, not an individualized injury. With respect to the election's claim, that injury inures to the legislature, not to an individual candidate or officeholder or voter. And I think that the law is well-established that there is no standing of an individual to supersede the right of the legislature to litigate that issue. One other quick question. Could the Attorney General have sued if the Attorney General believed that all the rules that Judge Holder was talking about were being violated in this drive-through voting? Yes, Your Honor. I do presume that the Attorney General could have acted if it had wished. And I will also note that with respect to the election's code, under Section 301-061 of the Texas Government Code, the legislature could have authorized counsel to appear on behalf of the legislature as a body to litigate this election's clause claim. They did not do so. Thank you. Thank you, Your Honor. This argument will now hear from my colleague. Yes, there's one more. Go ahead. Good morning, Your Honors, and may it please the Court. Adriel Cepeda for various intervener Harris County voters. The intervener appellees agree with the County. This case was non-justiciable the day it was filed, five days before Election Day, and it is non-justiciable now. The plaintiffs lack standing twice over. They allege a classic generalized grievance. They only ask that the lobby followed, but that is an interest that follows that every voter in Harris County, indeed every voter in Texas, would have, and that just comes from the Supreme Court's Lujan case, for example. To the extent the plaintiffs now ask for a prospective remedy, for a forward-looking remedy that this Court blocked drive-through voting in Harris County going forward, that goes to an unripe and speculative injury, and here's why. Because the Texas Code requires, at Section 86, that the Harris County Commissioner's Court approve a plan before it is put in place. Now, the Clapper Supreme Court case, for example, refers to the independent judgment of independent decision-makers as an intervening step that would destroy standing in such a speculative framework, and that is precisely what you have here. You have a five-member court that we don't know how they will decide in the future. Back to the generalized grievance question, suppose a group of individual voters, analogous to your clients here in Travis County, sued the Travis County Commissioner's Court and the Travis County Elections Administrator or County Clerk, whatever Travis County uses, and they want to drive-through voting in Travis County. Would that be a generalized grievance? I would think so, Your Honor. They are suing to get drive-through voting? Yeah. They say, oh, look, our friends in Harris County, they can do it. We'd like to do it in Travis County. This creates unequal voting rules across the state. We think we should do it here to equilibrate, and so we'd like to sue in Travis County to get the access to drive-through voting. Is that a generalized grievance? It would be a generalized grievance as to—the Travis County voters might have a standing to bring that claim, but— Then why would they have standing to bring that claim, but these voters, these defendants have a generalized grievance? I'm sorry, these plaintiffs, excuse me. Sure. These voters were all in Harris County, Your Honor. These voters all could have used the drive-through way of voting. The plaintiffs could have used it. In fact, I have the honor of representing some voters who voted for the candidate plaintiffs, and the candidate plaintiffs themselves were being elected by voters in Harris County, all of whom could have voted in Harris County, so to the extent it affects any voters in Harris County, it affected all of them. That is a quintessential generalized grievance. Isn't that true in Austin? If I want to do drive-through voting—I'm in Dallas County, but if I want to do drive-through voting in a county, and so that's why I'm suing, if that were allowed, it's not just me. I'm not claiming some special disability or problem that makes me want to drive through. I'm just saying we should all get to drive through because they're doing it in Harris County. Why isn't that generalized? Sorry, I understand now. Yes, I think that would be a generalized grievance, and, you know, there may be some— If I have a disability, I can do the curbside. That's a separate— Right, there may be some other right that a plaintiff like that could be trying to vindicate, for example, if they're saying that it is— But if I just said I'm in great physical shape, I'm terrific, I have great mental shape, I can drive well, I can walk well, but I want to vote drive-through, does that give me standing in Dallas County or—assuming argument I'm not a circuit judge. I would— No. No, I wouldn't think so, Your Honor. Not on that—I mean, you could be asserting, for example, a claim under—saying that your vote to—right to vote is being infringed in some way or another by the fact that you cannot vote like that, and then it would have to, like, be adjudicated, but just on that hypothetical, I don't think that's right. But, Your Honor, if I may go to the point of standing under the Elections Clause, no case of the Supreme Court recognizes standing for private parties or private candidates to bring cases under the Elections Clause. The Elections Clause implicates a legislative right, and the Carson case, which the plaintiffs bring up, if I may quickly speak to that, Your Honor, is frankly wrongly decided. It has been cited 14 times since it was decided, not once approvingly. The Third Circuit in Bognett, the Eleventh Circuit in Wood v. Raffensperger, and district courts in Arizona, Michigan, and Wisconsin have gone to great lengths to say that it was wrongly decided, in sum and in brief, because it does not account for Lance v. Kaufman, which is binding precedent on the Eighth Circuit, on those courts, and on this one as well. It doesn't engage with the fact that the Elections Clause implicates legislative rights, doesn't give private rights to plaintiffs to sue—sorry? Can I ask one follow-up? Judge Oldham has a question. Sure. I thought that we all agreed that the controlling opinion on the Elections Clause is Bush v. Gore, which, as the case caption would tell you, involves candidates. Sorry, Your Honor. I thought everyone in this case agreed that the controlling precedent on how to interpret the Elections Clause was Chief Justice Rehnquist's opinion in Bush v. Gore, which, as the case caption illustrates, involves a dispute between two candidates. Even if—well, first of all, Lance v. Kaufman is an Elections Clause decision where the Supreme Court said that four voters who were trying to vindicate rights under the Elections Clause did not have standing to bring those rights. To the extent Bush v. Gore raises issues regarding the Elections Clause, first of all, I believe that portion of the opinion is said that had no precedential value past that opinion. Second, to the extent it refers to the Elections Clause, it speaks precisely to significant departures from the statutory code. That is what may give rise to an Elections Clause violation. I would submit, Your Honor— The argument there was that it was affecting the counting of the votes for the candidates. I didn't see that argument here. Well, there are two parts. In Bush v. Gore, that was the problem, counting the votes for those candidates. There's two parts. The Bush v. Gore goes to both the Elections Clause issue and to the Equal Protection issue. But I'm talking about their standing. Here, if we were talking about the votes for, you know, the Honorable Steve Toth, that would be a different case, right? The counting the votes. Sure. If somehow the word Toth was rejected by the Internet or something, and therefore the votes didn't count, that would be something that person could bring a lawsuit over, correct? Absolutely. If similarly situated votes were being counted differently, yes, that would implicate that the Equal Protection portion of Bush v. Gore— I want to be sure I didn't interrupt you. Okay, thank you. Your time is up. We appreciate it. Thank you, Your Honor. Your Honor, I would like to begin by pointing out to the Court that in Judge Hannon's opinion and the briefing by the appellees, they take the position that only one group has standing to pursue a cause of action for violations of Article I, Section 4, Clause 1. And that's the Texas Legislature. And here's the problem there. As this Court is well aware, the Texas Legislature meets on the odd-numbered years for 150 days. So, for the Texas Legislature to timely act would be impossible in that the elections occur on an even-numbered year. They don't meet until January of the odd-numbered year. That's why I asked about the Attorney General. Well, I— Well, there are people violating the law. The Attorney General, you know, tends to have a concern about that. Well, in fact, the Attorney General wrote a letter to all the election clerks, including Mr. Holland, saying this form of voting is illegal. And that, too, is part of the record. Do you think he would have brought a suit? I believe that a candidate who is running for federal office, who is directly in the cause— My question is, could the Attorney General, who thinks that the Harris County Commissioner's for an illegal process, have sued that court, the County Commissioner's Court? Arguably, yes, Your Honor. But I don't think that's the only group that could. So, the appellees here have taken the position that a federal candidate who, as Judge Hainan said in his opinion in footnote one, has put blood, sweat, and tears, money into the process, that person is directly referenced under Article I, Section 4, Clause 1. That's the people we're talking about, senators and representatives. This is someone who is running for office. And so what you have is one group of people voting illegally, arguably under the election code, because there is no way to glean from the Texas election code that there's anything resembling drive-thru voting. In fact, everything that Judge Oldham pointed out, those provisions that are there to protect the integrity of the ballot box and the electioneering issues and the poll watcher issues, none of them apply to a scenario involving drive-thru voting. And that's why one of the affidavits that we attached from a poll watcher was saying we couldn't see. There were multiple people in a truck. The truck was too high. We had no idea what was going on inside of that truck. And it also prevents a scenario where we put in the record to folks on Facebook and Instagram voting. I don't judge, but I do believe a poll watcher should be able to see if someone's right next to you telling you how to vote. And that's what a poll watcher can do in a traditional situation where you have a voting station, as the code contemplates, a polling place, as the code contemplates, all within a building or a structure. And I've been to polling places where those little mini structures are all pretty close together and in a kind of big room. So I mean, I'm not sure that that necessarily means they couldn't be whispering to me. But I could. I don't suggest that I've ever done anything illegal in voting. Right. Or anyone else. Yes, ma'am. Yes, John. All I'm saying, Your Honor, is the code expressly allows and prohibits certain things. And the courts have made it very clear that if you want to infer something, you can't do it for convenience. And that's what they've done here. They've created a new form of voting for the convenience of the electorate. And so to the extent that illegal votes are cast, they cancel out legally cast votes. And if you look at every case they cite, for instance, Lance versus Kaufman, that involved four different voters. It didn't involve a candidate who was directly impacted. Additionally, we have a county that's acting differently than every other county across the state of Texas. So we have this one, the largest county in the state of Texas, adopting this new form of voting, while counties like yours, Dallas County, are not using that form of voting. So that obviously has, that there's an equal protection argument that we raised in our briefing, which I won't go into now. But there's clearly a significant departure from the election code. And it goes to Chief Justice's concurring opinion, Bush v. Gore. And again, the parties there were the candidates under Article I, Section 4, Clause 1. It was a party. It was President Bush. It was Vice President Gore at the time. So to argue that somehow only the Texas legislature has standing, and that you can't bring this after the fact, because it would then be moot, would be to say that heads we win, tails you lose. There would be no scenario where the plaintiff would ever have a remedy under the law if you buy into the reasoning that the appellates are asking this court to adopt. Because the legislature would only meet after the election. Election would be over. And then they would be arguing that it was moot. So, Your Honor, I think there's clearly Judge Hayden struggled with this issue. And he notes that. It says that he can see a scenario, arguably can see a scenario where a federal candidate has standing. And then you have the voters in Harris County being treated differently than the voters in, say, Dallas County, in that there's a whole different form of voting being taking place in Harris County, where 120,000 plus individuals are voting that is not allowed in Dallas County, or not being done in Fort Worth, or Tarrant County, or Travis County, or any of the other major counties. And so we have a system that's not contemplated by the Texas Election Code being unilaterally put in place by a clerk. And finally, Judge, the scenario that we've created, Commissioner's Court is the same as it was at the time this was put in place, other than one Republican has been changed by another Republican. The exact same folks are there. The same scenario involving the pandemic is also existent. So I would argue that with respect to capable repetition. Thank you for your time. We're about to take a break. But first, I want to thank you all for your arguments. Always very interesting to address election issues. And we really appreciate y'all's thorough arguments. And that case is now under submission. And we will take a 10-minute break.